Good morning, and may it please the Court, my name is Brian Grossman, and I represent Appellant Amber Johnson. I'd like to take my time and address some of the major themes that we put forth in our brief. The first one, and we've been touching upon it in the last oral argument, is the reasonable jury standard. That's the standard that the District Court must apply in deciding whether to grant summary judgment. And here the question specifically is, could a reasonable jury conclude that Amber Johnson was the source of the grant partnership between LaMelo Ball and PUMA? I'm going to jump in there. Does your argument depend on there being a material difference between PUMA being interested in the Ball Brothers as a group versus PUMA being interested in the defendant in this case? One hundred percent. So talk me through that because I'm not quite sure I understand what the material difference is there. Certainly. The grant partnership between the Ball Brothers on the one hand, and LaMelo Ball on the other, is both quantitatively and qualitatively different. You're dealing with, on the one hand, a group endorsement versus, on the other hand, an individual endorsement. For example, if the musical group Destiny's Child was interested in endorsing Louis Vuitton handbags, they might hire CAA to explore that possibility for them. While at the same time, Beyonce might think to herself, I wouldn't mind doing an endorsement for Louis Vuitton myself. So she goes and she hires CAA and Amber Johnson and tells both of them, I'd like you to explore an individual endorsement for Beyonce. And sure enough, for whatever reason, CAA focuses on the group, Destiny's Child, whereas Amber Johnson focuses on Beyonce. And sure enough, what turns out is an endorsement between Beyonce and PUMA as a group. I don't understand why this case is any different from the cases in California that have recognized the source doctrine. And it is clear that the first time they discussed some sort of a partnership between your client and Mr. Ball, he told her that they had already been talking to PUMA about a brand endorsement deal. So you're not claiming that she was the source of that contact, are you? We are claiming that she is the source of the endorsement deal that ultimately transpired between them. But if they're already interested in him before she enters the picture, how could she claim to be the source who introduced the parties at PUMA to LaMelo when LaMelo was already on their radar? That's what's not making sense to me. She absolutely was not the source of the introduction of LaMelo Ball to PUMA, and we have no never said that she was. But that's not the party's contract. The party's contract is not to make an introduction. It is not to generate interest in a player who was nationally known at the time. You don't need Amber Johnson to develop interest for PUMA. The contract was... Is there anything in the record to indicate that PUMA's interest in LaMelo was somehow different if he was part of a group with his brothers versus if he was an individual? I mean, your example with Beyonce and Destiny's Child seems a little bit inapt to me because when you're talking about athletes who are not playing on the same team, which the brothers were not, they were just individual athletes that happened to be related, it doesn't automatically follow that the brand might have a different level of interest in the person, whether the person is part of the group or the person is individual. So is there anything in the record that tells us that LaMelo was, like, less attractive to PUMA as an individual and so Ms. Johnson was needed to convince them? Well, all we have in the record is that PUMA was interested in all three Ball brothers. We also know that at the time they were interested in all three Ball brothers, there was no particular interest in LaMelo Ball. Mr. Evan Olesh testified that he wasn't on their radar at the time for individual endorsement. Martin Krzyzewski testified that he had LaMelo Ball's phone number and didn't call it. Well, wasn't that because he was under 18? So that is an explanation that was given, but there's no law that precludes you from entering into a contract with a minor but not reaching out and saying, hey, how's it going? We're interested in you. So I don't think that that is compelling, but it is a little weird for corporate people to be calling kids. Okay, well, that's only one aspect of the record. You had several instances where the record demonstrates that LaMelo Ball was being considered solely as part of the Ball brothers combination, that there was no interest whatsoever in him individually and no efforts made to develop that interest until Amber Johnson contacted PUMA. Well, would you agree that it's Arden's text message with Amber Johnson was the first communication between the two, the first time that PUMA responded to Ms. Johnson? It's the first time that PUMA directly responded to Ms. Johnson, but the record also shows that when Ms. Johnson contacted PUMA and word got to Evan Olesch that LaMelo Ball was a possibility for an individual endorsement, he reaches out to Arden Krzyzewski and says, contact this person ASAP. And this is the problem. Arden then says to Ms. Johnson, are you going to be doing his shoe contract? That's not a first contact. That means that PUMA thinks that the shoe contract is already in the works and done, and she's going to be doing it, which means there's a contract already being contemplated, and they're reaching out to Johnson. Are you going to be finishing it, essentially? No, there is absolutely no evidence in the record, Judge Pumatay, that there was a shoe contract in the works between LaMelo Ball individually and PUMA. So why did Arden say, are you going to be doing his shoe contract? Well, it's because Amber Johnson, when she reached out to PUMA, said, I am interested in doing an endorsement deal for my client, LaMelo Ball. And what does PUMA make? They make shoes. So I think you're drawing an inference for which there's not sufficient evidentiary record, and that would just be a very odd opening statement from PUMA, like, oh, I'm interested in, you know, representing LaMelo. Are you going to be doing his shoe contract? Isn't usually not the first thing you would say if that's your first contact, or the first time you thought about it. I would beg to differ, because that's what PUMA does with basketball athletes. They do shoe contracts. They don't do purse contracts. So, and another interesting point is that at that point in time, Arden Krzyzewski was already dealing with CAA. And he says to Ms. Johnson, are you doing LaMelo Ball's shoe contract? Okay? But, which means that what Arden Krzyzewski is doing is he's distinguishing in his mind the preexisting communications with the Ball brothers versus what Amber Johnson is saying. And she said, I represent LaMelo Ball individually, which is why he's coming and drawing that distinction. She's not saying, well, I thought CAA was doing his shoe contract. Because what he knows at that time is that PUMA is dealing with the Ball brothers as opposed to LaMelo Ball. So, to answer. In regard to the shoe contract, right? Yes, of course. I mean, I'm still confused about why the source hasn't already been established between PUMA and all three of the Ball brothers. And you're right, Your Honor. If you are equating an endorsement contract of the Ball brothers and equating that to an endorsement contract for LaMelo Ball individually, if you're equating them, I lose. Right. But doesn't that explain why Mr. Krzyzewski would ask in the initial call with your client, you know, basically, well, wait a second, we're already dealing with CAA? Are you essentially affiliated with CAA? Or do you have some kind of, I mean, inherent in that question is, who are you and why are you here? And that's exactly what he was asking. He's asking her if she's doing his shoe. But that doesn't prove she's the source. It just proves that PUMA's trying to figure out who she is. Okay, but you have to follow that and go further. And she says, yes, I'm the source. And they discuss. Well, the fact that she claims to be the source doesn't answer the question. No, it doesn't, Your Honor. And if I can continue, they negotiate, they discuss, they have preliminary discussions, at least before Mr. Jackson puts the kibosh on them. And eventually they find out from his manager, no, she's not speaking for us on the shoe contract. Yes. Ultimately, they do a deal with PUMA alone. After CAA complains to Mr. Jackson, saying, who is this Amber Johnson person? And then he thereafter lies and says, oh, she's just some black chick I know. Where at the time. Who was this? Yeah, at the time he says black chick. I don't know. I read the text message. At the time, he was well aware that she was working for LaMelo Ball and well aware that she was soliciting PUMA. He knew that. See, there are text messages that show that. That's where you're carving it just falls flat with me. All of that is after the contact has already been made. The fact that she was receiving some of the shoes and whatever other apparel they wanted him to wear on the basketball court doesn't prove she was the source of the contact. What proves she was the source is the absence of any evidence whatsoever. Not some evidence, but the absence of any evidence whatsoever that CAA was pursuing an individual endorsement deal for LaMelo Ball until Ms. Johnson told PUMA that LaMelo Ball was interested in such a deal. But then CAA contacts, I don't know if it was the manager or PUMA, to say who is this woman and basically why is she butting her nose into our deal? It's because Mr. Jackson told Ms. Johnson that CAA and Ms. Johnson had non-exclusive rights to negotiate on behalf of LaMelo Ball. But he changed his answer. He said non-exclusive first and then in that same message he said exclusive. No, it's the other way around. The other way around. Yes, you can see it's the other way around. He said exclusive and then he said non-exclusive, and that's the reason why they're both. How old at the time that he's having this discussion? Mr. Ball. Yeah, LaMelo. 17. 17, yeah. I don't think that the age issue is before the court. Well, I'm not so sure it's irrelevant since that was one of the reasons why the PUMA people said we're not sure we want to go there while he's still a minor. When Mr. Krzyzewski gave his voluntary declaration in support of the motion for summary judgment, that's surely what he said. But it's not what he was saying at the time when Ms. Johnson contacted him, when Mr. Olesz told Mr. Krzyzewski to reach out ASAP. There's nothing for Mr. Krzyzewski at that time saying that, oh, we should hold off, we should wait, he's only 17 years old. He jumped at the opportunity to do that. And I need to stress. Do you want to save any time for rebuttal? I would, Your Honor. But that's your full time. Well, then I will do that, and I thank you. Thank you, Your Honors. May it please the Court, Alexander Cody on behalf of LaMelo Ball. I'd like to focus on the argument we just heard the most about, which is the distinction between the family deal and the individual deal. I would first agree with Judge Tallman that it doesn't make a difference. If there's interest, there's interest. But I want to focus on the facts of the case, because even if there was a difference there, be it qualitative or quantitative as we heard, the evidence is that PUMO was interested in the individual deal from the get-go. And I would point you to Mr. Krzyzewski's declaration, which is in the record. It's pages 2180 is where it starts. And he says right at the beginning of the declaration, we were interested in a deal with the Ball brothers either individually or collectively. So that's where we start. We start with an interest in both. And then he goes on to say, we communicated that interest to CAA in April and May. Well, the only problem with that is there is a text message from Arden to Ms. Ball that says, this is the day after they first communicated. And he said, we had a nice meeting yesterday. We kind of like his vision of doing his own thing. So that seems like it's a new thing happening, that PUMO's interest in Lamello individually is not from the start. Well, but that's what he says in his declaration. He says it was this text message, which is probably more contemporaneous and more accurate. For sure. We're starting down a process. So at the beginning of the process, we're interested in the group, the family, or individually. And as we narrow down our possibilities, they are moving towards individual, which is, of course, where they ended up. That's a process of how you go from the initial contact, the source, to where we ended up, which is the final agreement. That's a step on the route. No doubt about that. I mean, it is some evidence for Ms. Johnson that, you know, the day after they talk, and a couple of days after she contacts PUMO for the first time, he says, we had a meeting yesterday, and we like his vision. You know, it's like, oh, yeah, that is something we are interested in. It was something they were interested in. Of course, it's where we ended up at the end of the day. But the interest preexisted that text message. That's what Mr. Krzyzewski says in his declaration. He says that was the interest from the get-go. It was alternative. We had multiple interests. One was a group interest, and one was an individual interest. But he ended up, the evidence in the record about there was hesitation about dealing with Lamella individually because of his age. Yes. There was hesitance about that. And the hesitance was not just his age, but that he wasn't in the 2019 draft. And the theory here is that I believe there's a concession. There was interest in Mr. Ball, at least at the outset. And then the deal went dormant. That's the word used in the briefs. And that Ms. Johnson should get credit for waking the deal up in some sense. There's two problems with that. One is it's contrary to what the contract says. The contract doesn't say she gets compensation for waking up a preexisting discussion. It says she has to find or source the discussion at the outset. If it's true, I mean, I understand you're going to argue about the facts, but just run with me for a minute so we can piece this out. If it's true that we start off with this is a group, we want the package for whatever marketing reason that Puma would want that, we want all of them. And that's all the energy is focused there. And we're looking at Lamella individually. No, he's too young. We want the group. And then you have a new person enter the scene who makes the pitch for the individual deal and all of the benefits of the individual deal. Why isn't that, if those were the facts, why isn't that person who intervenes later and makes the pitch for the individual deal entitled to the benefit of that work? Well, I know you want me to assume those are the facts in this case, and I will do that. She still was not the source of the interest in the relationship. They were having discussions before she came on board. And as Mr. Krzyzewski makes clear in his deposition and testimony cited by my friend, they made a decision in May that the only brother they were interested in was Lamella Ball going forward. That was Puma's decision in May. We're no longer interested in a family deal in May of 2019. That's two months before she shows up. Exactly right. So she didn't introduce an idea to Puma that they didn't already have. They had already made that decision two months prior. So that is the reason why she's not entitled under the scenario you suggested, Judge Forrest, to the compensation because it was a decision that had already been made. She didn't introduce some new idea to Puma that they weren't already aware of. And as Mr. Krzyzewski explains, they conveyed that interest to CAA before Ms. Johnson was even on the scene. Do you agree that under the terms of this contract, she needs to source the deal, not source the larger relationship? Okay. So that's a, as asked in the district court, what's the difference between those two terms? We didn't get a very clear answer. And I'm not sure we got a clear answer today. But I don't think that's right because for a couple of reasons. One, interest always precedes the deal. Right? It's just a question of timing. You can't have a contract without an interest in the contract because a contract reflects departing intentions. So I'm not sure there's actually much of a difference that matters in that case other than the timing of how the tree grows. But more importantly, her job was not to source a deal. Her job was to source a potential deal. That's how the very first paragraph of the complaint describes her job. Her job is to identify potential opportunities, potential endorsement opportunities for Mr. Ball. And she says later in the complaint that what she found later became a deal. But she didn't find the deal. She found something less than the deal. Or I wouldn't say less. I'd say earlier than the deal because it's really just a temporal difference. And the one substantive case relied on by the appellant here is the Zalk case from the California Court of Appeal. And as cited in the appellate brief, opening brief, what that case says is the finder only brings the parties together. And that's all they do. Then the parties negotiate their contract. That's the difference between what a finder does, which is the analogy being drawn here, and what agents and lawyers do. So her job wasn't to find a partnership. Her job was to find interest. And she concedes that's actually all she found. What is argued in the appellate brief, page 3, she says Ms. Johnson conveyed Ball's interest in forming his own brand partnership to Puma. And that's all she did. She just conveyed interest. She deals only in interest. She doesn't deal in conclusive contracts. She doesn't bring executory contracts. I don't quite understand that because, of course, she doesn't get paid unless the deal materializes. It doesn't get paid for unless the deal materializes. So if her only role is to get somebody to, like, return a phone call and be like, oh, hey, I might have interest there, that doesn't quite make sense. Well, her role is defined by the contract, which is to bring the people together who hadn't already been together. And an example of that is in the record. It's the deal that she initially spoke with Mr. Ball about, which was his appearance on a, I believe it was a streaming online game show, video game show, called Game Time through a company called Caffeine. Mr. Ball had no idea what Caffeine was. He had never done anything with them before. And she brought that deal to him. And he ended up appearing on the show. And he got compensated for his appearance. And if this contract had been in effect at that time, she would have been entitled to compensation from it because it was a new interest, a new relationship that had not existed before her involvement. So that's what led, according to plaintiffs, to the agreement in the first place. The oral contract arose out of that experience. And that experience explains the kinds of things that Ms. Johnson was supposed to be doing, which is bringing new people into the relationship, not pursuing existing relationships, which is the intermission. When she negotiated for a second appearance on that show, he was paid something like $18,000. I believe, Your Honor, that was prior to this oral contract going into place. No, no, no. I agree. But did she seek some kind of a commission for this? From him? Yes. I don't believe so. I believe at that time there was no relationship. I believe she was actually working for the company or perhaps the celebrity. Sponsoring the show. Correct. Correct. That's right. I guess I'm going to take this one last time and give you a new hypothetical. If you had an athlete who was sort of a superstar youth athlete and had an endorsement deal with a company that expired, you know, let's say when he was 17 or something, and then he goes into adult athletics and his performance is more mediocre. I understand that's not the facts of this case, but I'm just trying to sort of get it. So more mediocre, not an obvious target for endorsement. And so then you have someone new enter the scene. To go back to that first company he had the endorsement with, to try to pitch, you should sign this guy as an adult athlete as well. Would you agree that under how this contract was formed, that coming in at that stage of the proceedings would be sort of sourcing a new situation? I mean, the relationship exists, right, because they had the endorsement deal from the youth period. So it's not introducing parties and sort of interest in the very sort of very general way, but it is sort of making a pitch for a particular business arrangement. So I think the key there might turn somewhat on the timing. It might turn on what the prior sponsor partner has said. If they say, we're no longer interested in sponsoring you or having a contract with you anymore, and then the finder somehow resurrects a dead deal that might qualify as finding in that context. That's not the case here, where PUMA says we have interest multiple times throughout the summer of 2019, and then they ultimately consolidate a deal. A deal never died. It was actively ongoing. The undisputed evidence is that PUMA was just waiting for the draft to conclude it, because Mr. Ball was not in the draft. Only his brother was. And for him to turn 18. And as soon as those milestones passed, the discussions accelerated, and of course the deal was reached. So I think it might depend on the precise circumstances of the hypothetical. But in this context, I don't believe it's disputed that PUMA expressed its interest individually, and then it waited for those milestones to pass. And as soon as they did, the conversation accelerated and a deal was signed. And that's how it went here. I want to touch briefly on something that Judge Bumate mentioned, which is the response to Mr. Amber. Ms. Johnson's email, the unsolicited email to the customer service address of PUMA, fully supports and illustrates the point that I'm trying to make about the individual interest. What Mr. Krzyzewski says about that email is he says, we had already established when I got that email that PUMA was interested in Mr. Ball, and that we had been in contact with CAA about signing him. That's what he says in his declaration. And the reason why he reached out, according to his declaration, is because he thought Ms. Johnson was a publicist or had some different role than CAA, because CAA is who they're talking to about the endorsement deal. And Mr. Krzyzewski returned the call, ASAP as emphasized by my friend, because they're already in discussions. It wasn't a cold call. It wasn't ASAP in response to a cold call. It was ASAP in response to someone who's already sitting across the table, and we just don't know what Ms. Johnson's role is in this negotiation we've been having with CAA. And what's important about Mr. Krzyzewski's declaration is the district court really focused on it in reaching its ruling. And the district court said to Mr. Grossman, my friend, said, do you dispute anything in this declaration? That's in the record at page 43 of the excerpts of record. And his response was, we have no evidence in the record to contradict Mr. Krzyzewski's declaration. That's the whole ballgame. Mr. Krzyzewski explains we had individual interest from the outset. He says we conveyed it to CAA. He says they conveyed it to us. He says after May, we narrowed our interest down to Lomelo Ball exclusively. And he says that when Ms. Johnson emailed, I responded because we had been talking to CAA, and I wanted to know her role because, as Judge Bumate said, I thought we were working towards a SHU contract already. That's just on the PUMA side. Now, on the Ball side of the equation, we've got Mr. Jackson's declaration, which the district court also pointed out was undisputed. And he says that the spring meeting with PUMA was to start a discussion with all three brothers, including Mr. Jackson. And then he also points out that there was a discussion, a meeting that he attended with Lomelo Ball on July 23rd to talk about the PUMA SHU contract. And what is clear from the timing is that meeting was on calendar already before Ms. Johnson ever said a single word about PUMA to Mr. Jackson. He texts her about the meeting at 8.36 a.m. She doesn't say anything about PUMA that day until five hours later, five and a half hours later at 2 o'clock. And all she says is, PUMA just hit me back. Because the interest was undisputedly in Lomelo Ball individually, at the outset as an option and by May as a certainty, Ms. Johnson didn't find anything and therefore is not entitled to compensation under the oral contract. Thank you. Thank you. I'd like to first address some inaccuracies in the record as to when PUMA was interested in Lomelo Ball individually. In May of 2019, there was a meeting between PUMA and CAA. The only Ball brother discussed at that meeting was Lonzo Ball, not Lomelo Ball. That is in the record. As to that time period, Gordon Krzyzewski testified that PUMA's interest was in a, quote, broader opportunity with the entire Ball family. In that time period, in May of 2019, Evan Olesch testified, quote, we were not actively pursuing Lomelo Ball at that time. There was, in fact, no movement towards an individual endorsement deal, either by Mr. Ball or his representatives at CAA until Ms. Johnson started that process with respect to this business about waiting for Mr. Ball to turn 18. If that's the case, then why did PUMA instruct Gordon Krzyzewski to jump on this opportunity before he turned 18? Why did Mr. Krzyzewski say, aren't you doing the shoe deal and engaging in conversations with my client before Mr. Ball turned 18? It's simply an assertion that's not supported by the record. The record is that there is no evidence of any movement towards a brand partnership during this time period. Interest, yes. Relationship, yes. We have always conceded that, but the contracted issue calls for being the source of an actual brand partnership at the turn of 18. Oh, I believe, oh gosh, I don't want to misstate the record, Your Honor. I think it might have been later in the month of August of 2019, but not when the conversations initially began. But here the question is, what evidence is there of any movement on behalf of Mr. Ball or CAA to pursue an individual brand partnership before Ms. Johnson began? I would say there is none. But even if there was some, the interpretation of that evidence and the ruling upon that evidence should be the function of a jury. And we believe a reasonable jury could rule that Ms. Johnson was the source of that brand partnership. Thank you. All right, thank you, counsel, for the helpful argument. The matter of Johnson versus Ball is submitted, and we are in recess. All rise. The court for this session is in recess.
judges: TALLMAN, FORREST, BUMATAY